IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| SUSANNA SCHAEFER, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | No. 3:14-CV-80 (CAR) |
| THE UNIFIED GOVERNMENT OF | : | |
| ATHENS-CLARKE COUNTY, | : | |
| GEORGIA; ATHENS-CLARKE | : | |
| COUNTY POLICE DEPARTMENT; | : | |
| Police Chief JOSEPH LUMPKIN, in | : | |
| his Individual and Official Capacity; | : | |
| Lieutenant CHRIS NICHOLS, in his | : | |
| Individual and Official Capacity; | : | |
| Sergeant CHARLIE WANG, in his | : | |
| Individual and Official Capacity; | : | |
| Lieutenant DAVID LEEDAHL, in his | : | |
| Individual and Official Capacity; and | : | |
| Sergeant JEFF CLARK, in his | : | |
| Individual and Official Capacity, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## ORDER ON MOTION TO DISMISS

This civil rights action filed by *pro se* Plaintiff Susanna Schaefer pursuant to 42 U.S.C. § 1983 is currently before the Court on Defendants' Motion to Dismiss [Doc. 15]. Having reviewed the Motion, the response thereto, and the applicable law, Defendants' Motion to Dismiss [Doc. 15] is **GRANTED** because the Complaint fails to state a claim against the Athens-Clarke County Police Department, the Unified Government of Athens-

Clarke County, Police Chief Joseph Lumpkin, and the individual Defendants are entitled to qualified immunity.

## LEGAL STANDARD

On a motion to dismiss, the Court must accept as true all well-pleaded facts in a plaintiff's complaint.[1]   To avoid dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[2]   A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[3]   The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports a plaintiff's claims.[4]

In reviewing the sufficiency of the Complaint in this case, the Court remains mindful that "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys, and will, therefore, be liberally construed."[5]   However, "[e]ven with pro se litigants, 'conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.'"[6]

---

[1] Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009).

[2] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

[3] Iqbal, 556 U.S. at 678.

[4] Twombly, 550 U.S. at 556.

[5] Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998).

[6] United States v. Korman, 07-80998-CIV, 2008 WL 5662165, at *3 (S.D. Fla. Nov. 5, 2008) (quoting Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1246 (11th Cir. 2005)).

## BACKGROUND

For purposes of this Motion, the Court accepts as true all well-pleaded facts in the Complaint and construes them in the light most favorable to Plaintiff.

On September 1, 2012, Plaintiff called Defendant Athens-Clarke County Police Department to report that someone had wedged a 10-foot board against her front door, leaving Plaintiff trapped inside her home.[7]  Plaintiff managed to break the board free from the door before Defendant Sergeant Charlie Wang reported to Plaintiff's home to investigate the call.[8]  When he arrived, Sergeant Wang pushed the board under the porch railing instead of taking a photograph of the board on the porch.[9]

When Sergeant Wang began questioning Plaintiff about the incident, Plaintiff informed him that she thought a man she met six years ago committed the crime.[10] Plaintiff explained that the man was not her boyfriend but instead described their relationship as a former friendship that did not end on the best of terms a couple of years earlier.[11]  When Sergeant Wang asked why she thought this man committed the crime, Plaintiff stated "she did not have any real proof that he did."[12]

---

[7] Compl. ¶¶ 12-13 [Doc. 1].
[8] *Id.* at ¶¶ 17-18.
[9] *Id.* at ¶ 18.
[10] *Id.* at ¶ 19.
[11] *Id.*
[12] *Id.* at ¶ 20.

In addition to the board incident, Plaintiff informed Sergeant Wang that, at one point, the man appeared to lay in wait for her in his van.[13]  When she came out of the house, he pulled up in his van, parked in front of her house, raised his arm with his hands and fingers in the shape of a gun, stared at her with a blank look on his face, and then drove away.[14]  Plaintiff told Sergeant Wang she had not been worried about this "odd lurking and driveby behavior," and, for a while, she found such gestures "almost kind of flattering."[15]  Plaintiff, however, recently changed her mind about the potential harm of this activity because she read in the newspaper that the man had been arrested for trespassing on another woman's property.[16]  In addition to these "odd lurking behaviors," Plaintiff also noticed unusual tampering around her house: things on her porch were rearranged, and she started hearing noises outside her window at night.[17]

After hearing Plaintiff's description of the events, Sergeant Wang stated that the man was not stalking Plaintiff and advised her to write the man and tell him to stay off her property.[18]  He then left without taking a crime report.[19]  Plaintiff took Sergeant Wang's advice and emailed the man.[20]

Later that day or the next, Plaintiff contacted Sergeant Wang's supervisor to complain that Sergeant Wang had destroyed evidence, did not understand the meaning of

---

[13] *Id.* at ¶ 24.
[14] *Id.*
[15] *Id.* at ¶ 27.
[16] *Id.* at ¶ 28.
[17] *Id.* at ¶ 25.
[18] *Id.* at ¶¶ 33-34.
[19] *Id.* at ¶ 35.
[20] *Id.* at ¶ 36.

4

stalking, and left without taking a report.[21]  Sergeant Wang then came back to Plaintiff's house to take a report.[22]  During his second visit, Plaintiff showed Sergeant Wang the email conversation with the man in which she told him to get help and leave her alone.[23]

Five days after Plaintiff initially called the police, on September 6, 2012, Defendant Lieutenant Chris Nichols called Plaintiff and introduced himself as the investigator assigned to her case.[24]  During that conversation, Lieutenant Nichols asked Plaintiff if she took any medication, suffered from hallucinations, or saw anyone for a mental disorder.[25]  Plaintiff informed him that she did not.[26]  Lieutenant Nichols also questioned her about the man she suspected of committing the crime, but Plaintiff did not elaborate on her past with him and just said she had no real proof it was him.[27]  Lieutenant Nichols advised her to get a "no contact order" so that the man could not write or call her anymore.[28]  Plaintiff expressed doubt that a "no contact order" would be useful because the man did not write or call her; instead, he acted out in other ways.[29]  Nevertheless, Lieutenant Nichols advised her that it was still a good option, and explained the process of obtaining a "no contact order."[30]  Plaintiff said she would consider it.[31]

---

[21] *Id.* at ¶ 37.
[22] *Id.* at ¶ 38.
[23] *Id.* at ¶ 39.
[24] *Id.* at ¶ 40.
[25] *Id.* at ¶ 42.
[26] *Id.*
[27] *Id.* at ¶ 44.
[28] *Id.* at ¶ 45.
[29] *Id.*
[30] *Id.* at ¶ 46.
[31] *Id.*

Four days later, on September 10, 2012, Plaintiff dropped off a copy of her prior email conversations with the man at the police station for Lieutenant Nichols.[32]  Then, on September 25, 2012, Plaintiff called Lieutenant Nichols to report new stalking activity in her area.[33]  Plaintiff told him she had started some late night surveillance in her car and finally saw the man driving a silver car.[34]  Plaintiff gave Lieutenant Nichols the car's model, partial plate number, and county tag, and asked him to look into it.[35]  Instead of looking in to this new information, Lieutenant Nichols continued asking Plaintiff about any mental health issues she had, and Plaintiff repeatedly told him she did not have any.[36]

Because Lieutenant Nichols acted dismissively to these new developments, Plaintiff complained to his manager, Defendant Lieutenant David Leedahl.[37]  Lieutenant Leedahl, however, was also dismissive and, in response to Plaintiff's concern about the stalking activity, he jokingly said "maybe he just likes you."[38]  When Plaintiff complained about Lieutenant Nichols' inappropriate questioning regarding her mental health issues, Lieutenant Leedahl himself asked Plaintiff if she took any medication or suffered from any hallucinations.[39]  Plaintiff also complained about inaccuracies in Sergeant Wang's report, which Lieutenant Leedhahl read to her over the phone.[40]  Specifically, Sergeant Wang

---

[32] *Id.* at ¶ 47.
[33] *Id.* at ¶ 48.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.* at ¶ 49.
[38] *Id.*
[39] *Id.* at ¶ 50.
[40] *Id.* at ¶¶ 51-52.

mischaracterized the board as 10 "inches" instead of 10 "feet" and inaccurately described the crime.[41]

On September 29, 2012, Plaintiff called the police to report that she heard someone picking the lock on her front door.[42]  By the time she looked out the window, no one was there.[43] An officer responded to the scene and left without taking a report.[44]

On November 4, 2012, Plaintiff reported to the police that her roommate saw a man who looked like the man Plaintiff described parked in front of her house in a silver sedan at night.[45]  Then, on November 15, 2012, Plaintiff reported that her side bedroom window had been unlocked, and a plastic knife slipped under the closed window frame over the burglar alarm sensor.[46]  Police responded to the scene but left without making a report.[47]

On November 20, 2012, Plaintiff called the police to report that her outside landline phone box had been smashed open and the inner lock box unscrewed.[48]  On November 22, 2012, Plaintiff called the police to her house at 2:00 am after Plaintiff heard someone outside her bedroom window.  Again, the police responded to the scene but left without taking a report.[49]

---

[41] *Id.* at ¶ 51.
[42] *Id.* at ¶ 55.
[43] *Id.*
[44] *Id.*
[45] *Id.* at ¶ 59.
[46] *Id.* at ¶ 60.
[47] *Id.*
[48] *Id.* at ¶ 61.
[49] *Id.* at ¶ 62.

On November 28, 2012, Plaintiff called the police to report several tampered items, including a partially unscrewed side window lock and clipped electric meter seal.[50] During the call she heard "an officer" say, "Yeah I know the situation here. I hear you are infatuated with this guy."[51]

On December 17, 2012, Plaintiff gave Lieutenant Nichols the full plate number for the silver sedan and requested that he look into it.[52]   Then, on January 30, 2013, Plaintiff called Lieutenant Nichols to find out what they were doing to help her.[53] Lieutenant Nichols said that he had not investigated any of the information Plaintiff had given him and refused to do so, implying that it was "all in her head."[54] Plaintiff then tried to speak with Lieutenant Leedahl again, but he just yelled at her and told her she needed help.[55]

On May 13, 2013, Plaintiff called Lieutenant Nichols again to find out what the police had done to investigate her case.[56]   Lieutenant Nichols was evasive and said that he did not know exactly what had been done.[57]   He also informed Plaintiff that Defendant Sergeant Jeff Clark made all the decisions about her case in the beginning.[58]   Lieutenant Nichols further advised Plaintiff to fill out an open records request, so she could find out

---

[50] *Id.* at ¶ 63.
[51] *Id.*
[52] *Id.* at ¶ 64.
[53] *Id.* at ¶ 67.
[54] *Id.*
[55] *Id.* at ¶ 69.
[56] *Id.* at ¶ 74.
[57] *Id.* at ¶ 75.
[58] *Id.*

what they did to investigate her case.[59]  She followed his advice, but her open records request went unanswered.[60]

Plaintiff submitted another open records request on April 2, 2014, and received incomplete information.[61]  In the documents she did receive, Plaintiff noticed inaccuracies in a memo written by Lieutenant Nichols memorializing their first telephone conversation.[62]  He put the wrong date and twisted her words, saying that "she didn't care if [the man] raped her" instead of stating "she didn't care if [the man] wrote her."[63]  Lieutenant Nichols also stated that it appeared as though Plaintiff was "a consumer of mental health services," when she repeatedly told him she was not.[64]  He also noted that he looked up the man's criminal history, noticed a pending trespass charge, and then deleted the file.[65]  Lieutenant Nichols stated at the end of the memo that he was placing Plaintiff's case in abeyance.[66]  After reviewing the documents provided pursuant to her open records request, Plaintiff saw that Defendants had done nothing else to investigate her case.[67]  Defendants did not even interview the man.[68]

---

[59] *Id.* at ¶ 76.
[60] *Id.*
[61] *Id.* at ¶ 77.
[62] *Id.* at ¶ 80.
[63] *Id.* at ¶¶ 80-81, Supp. Report [Doc. 1-1].
[64] Compl. at ¶ 82 [Doc. 1].
[65] *Id.* at ¶ 85.
[66] *Id.* at ¶ 84.
[67] *Id.* at ¶ 86.
[68] *Id.*

From September 2012 to February 2013, the stalking activity continued.[69]  During that time, Plaintiff made approximately eleven calls to the police to report criminal activity, ranging from criminal trespassing, burglary, vandalism, to "possible attempted murder."[70]  Plaintiff also sent "educational memos" to Lieutenant Nichols, Lieutenant Leedahl, and Defendant Police Chief Joseph Lumpkin regarding sexual predators, predatory stalking, and lock picking.[71]

Based on these facts, Plaintiff, proceeding *pro se*, filed this Complaint pursuant to 42 U.S.C. § 1983 against the named Defendants for violating her rights under the Equal Protection Clause of the Fourteenth Amendment.  Plaintiff alleges that the Unified Government of Athens-Clarke County, Georgia; the Athens-Clarke County Police Department; Police Chief Joseph Lumpkin; Lieutenant Chris Nichols; Sergeant Charlie Wang; Lieutenant David Leedahl; and Sergeant Jeff Clark unconstitutionally denied her police services on the basis of her gender.   In addition, she claims that Chief Lumpkin and police management failed to train staff regarding inappropriate gender stereotyping, the realities of lock picking and the *modus operandi* of sexual predators and predatory crimes, which contributed to an incomplete investigation of her case.  Plaintiff seeks both damages and injunctive relief.

Defendants now jointly move for dismissal of the Complaint.

---

[69] *Id.* at ¶ 57.

[70] *Id.*

[71] *Id.* at ¶ 58.

## DISCUSSION

A plaintiff may bring a private cause of action pursuant to § 1983 against those, who, under color of law, deprive a citizen of the United States, of "any rights, privileges, or immunities secured by the Constitution and laws."[72]  To state a claim for relief under § 1983, a plaintiff must allege that: (1) an act or omission deprived her of a right, privilege, or immunity secured by the Constitution and laws of the United States; and (2) the act or omission was committed by a person acting under color of state law.[73]  Here, Plaintiff alleges that Defendants deprived her of equal protection of the laws in violation of the Fourteenth Amendment by discriminating against her based on her gender.  There is no dispute that Defendants were acting under color of state law.  Thus, the only issue for the Court to decide is whether Plaintiff has sufficiently alleged that Defendants' acts, or lack thereof, deprived Plaintiff of her right to equal protection of the laws.

Plaintiff brings claims against Lieutenant Nichols, Sergeant Wang, Lieutenant Leedahl, Sergeant Clark, and Chief Lumpkin, in both their individual and official capacities.  Plaintiff also brings claims against the Athens-Clarke County Police Department and the Unified Government of Athens-Clarke County.  All of these claims are predicated on a violation of Plaintiff's constitutional right to equal protection.  Because the alleged facts fail to state a claim showing such a violation, all of Plaintiff's claims fail. The Court will discuss these claims in turn below.

---

[72] 42 U.S.C. § 1983.
[73] *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987).

I.      **Athens-Clarke County Police Department**

As a preliminary matter, Plaintiff cannot assert a claim against the Athens-Clarke County Police Department because the Police Department is not a "person" subject to suit under § 1983.  Whether an entity is subject to suit is determined "by the law of the state where the court is located."[74]  Georgia law recognizes three classes of legal entities capable of being named in a lawsuit: "(1) natural persons; (2) an artificial person (a corporation); and (3) such quasi-artificial persons as the law recognizes as being capable to sue."[75] "[S]heriff's departments and police departments are not usually considered legal entities subject to suit."[76]  Accordingly, Plaintiff's claim against the Athens-Clark County Police Department must be dismissed.

II.     **Individual Capacity Claims and Qualified Immunity**

Plaintiff alleges that the individual police officers—Lieutenant Nichols, Sergeant Wang, Lieutenant Leedahl, Sergeant Clark, and Chief Lumpkin—failed to properly investigate her complaints of criminal activity because she is a woman.  Defendants counter that Plaintiff's claims against them in their individual capacities are barred by qualified immunity.

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory

---

[74] Fed. R. Civ. P. 17(b).

[75] *Lawal v. Fowler*, 196 F. App'x 765, 768 (11th Cir. 2006) (quoting *Ga. Insurers Insolvency Pool v. Elbert Cnty.*, 258 Ga. 317, 368 S.E.2d 500, 502 (1988)).

[76] *Lawal*, 196 F. App'x at 768 (quoting *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992)); *see also Lovelace v. Dekalb Cent. Prob.*, 144 F. App'x 793, 795 (11th Cir. 2005) (holding Georgia county police department was not a legal entity subject to suit).

or constitutional rights of which a reasonable person would have known."[77]  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."[78]  Qualified immunity is immunity from suit and should be resolved as early as possible in the case.[79]

When a defendant invokes qualified immunity, the initial burden is on the defendant to show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."[80]  Once the defendant satisfies that burden, the burden then shifts to the plaintiff to show that (1) a violation of a constitutional right occurred and (2) that right was "clearly established" at the time of the violation.[81]

Here, the facts clearly show that Defendants were acting within the scope of their discretionary authority when they investigated Plaintiff's complaints.[82]  Therefore, the burden shifts to Plaintiff to prove that Defendants violated her constitutional rights and her constitutional rights were clearly established at the time of Defendants' conduct. Having fully considered the allegations in the Complaint, the Court finds Plaintiff fails to satisfy her burden on either prong of the qualified immunity analysis, and, as such, the individual police officers are entitled to qualified immunity.

---

[77] *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotation marks and citation omitted).

[78] *Id.* at 1194.

[79] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[80] *Ferraro*, 284 F.3d at 1194.

[81] *Pearson*, 555 U.S. at 232.

[82] *See Williams v. City of Albany*, 936 F.2d 1256, 1259 (11th Cir. 1991) (finding "no dispute that the defendants were acting within their discretionary authority as police officers during their investigation").

A. **Lieutenant Nichols, Sergeant Wang, Lieutenant Leedahl, and Sergeant Clark**

Plaintiff alleges that Lieutenant Nichols, Sergeant Wang, Lieutenant Leedahl, and Sergeant Clark unconstitutionally denied her a complete and accurate investigation because they harbored stereotypical beliefs that Plaintiff was a "hysterical" or "scorned" woman and discounted her complaints as the product of a delusional mind.

i. **Constitutional Violation**

To allege an equal protection claim, Plaintiff must allege that Defendants treated her differently than others calling to report criminal activity, and this disparate treatment was motivated by an intent to discriminate against her because she is a woman.[83]

Here, Plaintiff does not allege <u>how</u> Defendants treated her differently from any other person during the investigation of her complaints because of her gender.  In fact, the allegations in the Complaint show that the police responded to the scene every time Plaintiff called to report hearing noises in and around her home.  When they arrived, they had little, if any, evidence of criminal wrongdoing to warrant further investigation.  Plaintiff herself told the police at least twice she had no proof the man she suspected committed the acts at issue.  Even though they had no evidence, Lieutenant Nichols

---

[83] *See Glenn v. Brumby*, 724 F. Supp. 2d 1284, 1314-15 (N.D. Ga. 2010) ("To effectively make out an equal protection claim, Plaintiff must prove that she suffered purposeful or intentional discrimination on the basis of gender."), *aff'd*, 663 F.3d 1312 (11th Cir. 2011).  As recognized by Defendants in their Motion, courts also recognize a "class of one" equal protection claim in which the plaintiff is the only member of the class and alleges he or she has been treated differently from other similarly situated individuals. *See, e.g., Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Plaintiff does not appear to raise a "class of one" equal protection claim in her complaint or response to the Motion to Dismiss.  Therefore, the Court will not address it.

listened to Plaintiff's concerns and advised Plaintiff about how to obtain a "no contact order" against the man.  It is unclear from the Complaint whether Plaintiff took that advice.  Although Plaintiff may be unsatisfied that the police refused to do more, her dissatisfaction does not give rise to a constitutional violation.

Moreover, the inaccuracies in the police reports and the officers' questions regarding her mental health do not amount to a constitutional violation.  Mental illness is not gender specific.  Even assuming, however, that the officers' questions establish that the officers harbored gender stereotypes of the "scorned" or "hysterical" woman, Plaintiff fails to allege how those remarks affected the investigation of her complaints.  Without a discriminatory act, there is no constitutional violation.[84]  Although one might find the officers' references to her mental health or Lieutenant Leedahl's jokes insensitive, these statements alone do not give rise to a constitutional violation.

ii. **Clearly Established**

Moreover, even if Plaintiff established a constitutional violation, no clearly established law put Defendants on notice that putting inaccurate or incomplete information in the police reports, questioning Plaintiff about her mental health, and not doing more to investigate her complaints violated her constitutional rights.  The Eleventh Circuit instructs that "[t]he relevant, dispositive inquiry in determining whether a right is

---

[84] *See Ardis v. Danheisser*, No. 3:13CV366/MCR/EMT, 2014 WL 103232, at *6 (N.D. Fla. Jan. 10, 2014) ("[I]in order to assert a viable equal protection claim, a plaintiff must first make a threshold showing that he was treated differently from others who were similarly situated to him.").

clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[85]  In other words, the issue is whether the law gave the officers "fair warning" that their conduct was unconstitutional.[86]  "This analysis must be undertaken in the specific crucible of the case, and not as a broad general proposition."[87]  A Plaintiff can demonstrate that a right is clearly established in several ways: (1) by pointing to a "materially similar case [that] has already been decided," (2) by referring "to a broader clearly established principle that should control the novel facts of the situation," or (3) by showing that "the conduct involved in the case so obviously violate[s] the constitution that prior case law is unnecessary."[88]  When determining whether a right is clearly established, "[the Court] look[s] to law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of [Georgia]."[89]

Here, Plaintiff does not cite, nor could Court could find, any materially similar case in this Circuit that would put a reasonable officer on notice that failure to investigate further into Plaintiff's complaints, asking questions regarding Plaintiff's mental health, or putting inaccurate or incomplete facts in a report would violate Plaintiff's right to equal protection of the law.  Plaintiff cites to a Ninth Circuit case[90] and a law review article

---

[85] *Saucier v. Katz,* 533 U.S. 194, 202 (2001).
[86] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
[87] *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012).
[88] *Id.* (internal quotation marks and brackets omitted).
[89] *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013).
[90] *Elliot Park v. Manglona*, 592 F.3d 1003 (9th Cir. 2010).

16

discussing equal protection claims available to victims of domestic violence.[91] Neither of these sources is controlling.  Furthermore, this is not a case involving reports of domestic violence.

Plaintiff, however, does rely on binding Eleventh Circuit authority for the general principle that discrimination based on gender-based stereotypes violates the Equal Protection Clause.[92]  "A broad principle in case law is sufficient to establish clearly the law applicable to a specific set of facts facing a governmental official, when it ... does so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."[93]  Here, the Court finds this general principle against discrimination based on gender stereotyping did not put the officers on notice that their acts or omissions in this case constituted gender discrimination.

Finally, Plaintiff fails to show that Defendants' conduct in this case so obviously violated the Equal Protection Clause that prior case law is unnecessary to show the law was clearly established. "In some rare cases . . . a violation may be so egregious that the Constitution or a statute on its face may be sufficient to establish clearly the law applicable

---

[91] Jain, Niji, *Engendering Fairness in Domestic Violence Arrests: Improving Police Accountability through the Equal Protection Clause*, 60 Emory L.J. 1011 (2011).

[92] *See, e.g., United States v. Virginia*, 518 U.S. 515, 533 (1996) ("[The government] must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females."); *Glenn v. Brumby*, 663 F.3d 1312, 1319 (11th Cir. 2011) ('[D]iscriminatory state action [can] not stand on the basis of gender stereotypes.").

[93] *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002)) (brackets omitted).

to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law."[94]   Here, the Equal Protection Clause alone is not sufficient to put Defendants on notice that their acts or omissions were unconstitutional.   Accordingly, Lieutenant Nichols, Sergeant Wang, Lieutenant Leedahl, and Sergeant Clark are entitled to qualified immunity.

### ii.   Chief Lumpkin

Plaintiff also attempts to assert a supervisor liability claim against Chief Lumpkin. "It is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability."[95]   "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."[96]

Plaintiff does not allege facts showing Chief Lumpkin personally engaged in any unconstitutional conduct with respect to investigating her case.   Instead, Plaintiff contends Chief Lumpkin's failure to train police staff regarding inappropriate gender stereotyping, the realities of lock picking, the *modus operandi* of sexual predators, and predatory crimes against women caused the subordinate officers to violate her constitutional rights.   The

---

[94] *William*, 341 F.3d at 1270 (emphasis in original) (quotation marks and citation omitted).
[95] *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quotation marks and citation omitted).
[96] *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

requisite causal connection between a supervisor's failure to train and a constitutional deprivation can be established in several ways.   First, Plaintiff can show "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."[97]   In addition, "the causal connection may be established and supervisory liability imposed where the supervisor's improper custom or policy ... result[s] in deliberate indifference to constitutional rights."[98]

Plaintiff's claim against Chief Lumpkin fails for two reasons.   First, as explained above, Plaintiff does not allege facts showing a constitutional violation.   Since there is no underlying constitutional violation, there is no basis for supervisory liability.[99]   Thus, because the facts alleged show no constitutional deprivation, Chief Lumpkin is entitled to qualified immunity.   Second, even if the facts showed a plausible constitutional violation arising from the officers' investigation of Plaintiff's complaints, Plaintiff fails to allege facts demonstrating how Chief Lumpkin's failure to train caused the violation.   Indeed, the Complaint does not allege any facts suggesting Chief Lumpkin had notice based on a history of widespread abuse that a particular training was necessary, or that his failure to train officers amounted to deliberate indifference to Plaintiff's constitutional rights.   Thus, the claim against Chief Lumpkin must be dismissed.

---

[97] *Hartley,* 193 F.3d at 1269.

[98] *Id.* (quotation marks and citation omitted).

[99] *See Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005) ("Because we conclude that Plaintiff's constitutional rights were not violated . . ., Plaintiff cannot maintain a § 1983 action for supervisory liability . . . for failure to train.").

### III.   Municipal Liability

Similarly, Plaintiff asserts a municipal liability claim against the Unified Government of Athens-Clarke County (the "County") for failing to train its police officers. Counties and local governments are considered "persons" subject to suit under § 1983.[100] Nevertheless, "[t]he Supreme Court has placed strict limitations on municipal liability."[101] A municipality cannot be held liable solely on a theory of *respondeat superior* for the wrongful acts of its police officers.[102]  "Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1) that h[er] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."[103]

Plaintiff's municipal liability claim fails for reasons similar to her supervisory liability claim.  First, she fails to allege facts showing that her constitutional rights were violated.  Without an underlying constitutional violation, there is no basis for municipal liability.[104]  Moreover, even if Plaintiff could establish the police officers violated her constitutional rights, Plaintiff fails to allege how the County's policies or failure to train its officers amounts to deliberate indifference to her constitutional rights.  Indeed, Plaintiff alleges no facts showing the County had notice that a failure to train its officers was likely

---

[100] *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978)).
[101] *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).
[102] *Id.*
[103] *McDowell*, 392 F.3d at 1289.
[104] *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

to result in the violation of its citizens' constitutional rights.  Accordingly, Plaintiff fails to state a claim upon which relief may be granted against the County.

**IV.    Official Capacity Claims**

Plaintiff also asserts claims against Chief Lumpkin, Lieutenant Nichols, Sergeant Wang, Lieutenant Leedahl, and Sergeant Clark in their official capacities.  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [of which the officer is an agent]."[105]  Thus, the claims against these Defendants in their official capacities are merely duplicative of Plaintiff's claim against the County, and these claims are entitled to dismissal as such.[106]

<center>CONCLUSION</center>

Based on the foregoing, Defendants Motion to Dismiss [Doc. 15] is **GRANTED**, and Plaintiff's Complaint is **DISMISSED**.

**SO ORDERED,** this 1st day of June, 2015.

<div style="margin-left:40%">

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

</div>

---

[105] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).
[106] *See Joiner v. Fulton Cnty., Ga.*, 160 F. App'x 891, 893 (11th Cir. 2005) (affirming district court's dismissal of claims against defendants in their official capacities as duplicative of the claims against the County).